**In the United States District Court
for the Southern District of Texas
Houston Division**

| | | |
|---|---|---|
| **Trinseo S.A.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:20-cv-04051** |
| | § | |
| **Kellogg Brown & Root, LLC.** | § | |
| | § | |
| *Defendant.* | § | |

---

## Plaintiff's Original Complaint

This is a theft of trade secrets/confidential information case.  Defendant Kellogg Brown & Root, LLC ("KBR") unlawfully obtained the trade secrets/confidential information of Plaintiff Trinseo S.A. ("Trinseo") which allowed KBR to create a basic engineering design and technology licensing package that it sold to two Chinese chemical manufacturers, both of whom are now building an interfacial polycarbonate resin manufacturing plant in direct competition with Trinseo.[1]  Consequently, Trinseo has been forced to seek the Court's assistance to stop KBR's unlawful scheme to counterfeit and then sell to Chinese chemical manufacturing companies Trinseo's chemical manufacturing technology that Trinseo's predecessor, Dow Chemical Company, spent nearly ten years developing and for which Trinseo has spent multiple millions of dollars improving.  Without timely court intervention, KBR will not only unlawfully enrich

---

[1] This matter is arguably related to a matter already pending in this district and division that is numbered Civil Action No. 4:20-CV-0478, *Trinseo S.A. v. Steve Harper, et al* in which Trinseo is suing the person responsible for assisting KBR in its scheme.

itself, but will enable Trinseo's competitors to acquire an unlawful head start in the marketplace without paying the price in time, effort or expense and irreparably damaging Trinseo's competitive advantages and goodwill.

## I.
## Parties

1.     Plaintiff Trinseo S.A. is a foreign corporation with its principal place of business in Pennsylvania.  It does not reside in, nor does it have a principal place of business in, the State of Texas.

2.     Defendant Kellogg Brown & Root, LLC is a Delaware limited liability company with its principal place of business in Houston, Harris County, Texas.  The sole member of KBR is KBR Holdings, LLC, which is a Delaware limited liability company with its principal place of business in Houston, Texas.  KBR may be served by serving its registered agent, CT Corporation System, at its registered office address of 1999 Bryan St., Ste. 900, Dallas, Texas 75201.

## II.
## Jurisdiction & Venue

3.     The Court has original subject matter jurisdiction over the entire action pursuant to the Court's federal question jurisdiction, 28 U.S.C. § 1331, because at least one cause of action arises under federal law – the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(c).  In addition, the Court maintains subject matter jurisdiction pursuant to the Court's diversity jurisdiction, 28 U.S.C. § 1332, because there is complete diversity

of citizenship between the parties[2] and the amount in controversy exceeds $75,000 exclusive of interest, cost and attorneys' fees.  This Court has supplemental jurisdiction over claims based under state law.  28 U.S.C. § 1367.

4.      The Court has both general and specific personal jurisdiction over KBR. The Court has general personal jurisdiction over KBR because it has its principal place of business in Texas and has purposefully established minimum contacts with the State of Texas sufficient to subject it to personal jurisdiction consistent with due process under the Fifth and/or Fourteenth Amendments to the United States Constitution, and the Court's exercise of jurisdiction over KBR does not offend traditional notions of fair play and substantial justice.  In addition, the Court has specific personal jurisdiction over KBR because KBR: (a) has its principal place of business in Texas; (b) knowingly acquired some of Trinseo's confidential information/trade secrets from individuals who purposefully delivered the materials either while in Texas or via means of interstate commerce to KBR knowing that KBR was in Texas.  In addition, KBR unlawfully used Trinseo's trade secrets and confidential information to create its infringing PCMAX design package and drawings for the construction of polycarbonate manufacturing plants. Because Trinseo's causes of action arise directly from KBR's purposeful contacts with Texas, and because KBR has its principal place of business in this District and Division, the Court has general and specific personal jurisdiction over KBR.

---

[2]    Trinseo is formed under the laws of Luxembourg, but it has a principal place of business in Berwyn, Pennsylvania.  KBR is a Delaware LLC with its principal place of business in Texas and whose sole member, KBR Holdings, LLC, is also a Delaware LLC with its principal place of business in Texas.

5.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant maintains its principal place of business in this District and Division and because a substantial amount of the events giving rise to the cause of action asserted herein took place in this District and Division.

### III.
### Factual Background

**A.     Trinseo's Business and Polycarbonate Technology**

6.     Trinseo is a global materials company that, through its operating subsidiaries and affiliates, manufactures plastics, latex, and synthetic rubber, among other things.   One of Trinseo's businesses includes the manufacture of polycarbonate blends and resins.  Polycarbonates are tough, thermoplastic, synthetic polymers that can be formed and molded under heat.   Because of their toughness, high impact resistance, and relative ease of molding, blending and shaping, polycarbonates are used in many common products from eyeglass lenses, compact discs, automotive headlamp lenses and even "bulletproof" glass, to name a few.

7.     Trinseo traces its roots back to Dow Chemical Company ("Dow").   In 2009, Dow combined several of its businesses, including its polycarbonate and compounds & blends business, into a new entity known as Styron, which became the owner of all of the intellectual property associated with Dow's polycarbonate business unit.  In 2010, Bain Capital purchased Styron and later changed the name of the business to Trinseo.  In 2016, Bain Capital sold all of its stock in Trinseo, resulting in Trinseo's full independence as a public company, the stock of which is now publicly traded on the

New York Stock Exchange under the ticker symbol "TSE."  Trinseo has its domestic principal place of business in Berwyn, Pennsylvania, and employs approximately 2,000 employees in 30 countries.

8.     The intellectual property that Trinseo owns relating to polycarbonate resin manufacturing can generally be described as: (a) preliminary design packages ("PDPs"), design drawings of manufacturing plants, process flow diagrams, equipment specifications, and other confidential information regarding the design, commissioning, and optimization of interfacial polycarbonate resin manufacturing facilities; (b) the formulation of high quality polycarbonate resins with differing melt flows; (c) techniques for manufacturing high quality polycarbonate resins; (d) the concept, design, materials, specifications, operating instructions, software, control algorithms and plans to safely and efficiently design, build and operate interfacial polycarbonate resin manufacturing facilities; (e) the design of polycarbonate manufacturing plant components, such as the phosgene reactor, phosgene scrubber, dryers, devolatilization columns, piping and instrument design, along with the operating discipline, operating ranges, operating conditions and flowrates that are part of the operating code for such components; (f) the components contained within the continuous pipe reactor's pressure vessel containment system; (g) specially designed atomization nozzles used to atomize the polymer solution with high pressure steam without fouling or clogging the nozzle with polymer; (h) the "snake" and loop process used in the devolatilizing drying process, with associated drying tubes and collection header, all of which is key to efficient production of a flake polycarbonate product with a minimum of fines; (i) the design of the MeCl2 stripper

column that separates the polymer flake from the devolatilized methylene chloride solvent and devolatilizing steam: (j) the concept and design of the unique steam devolatilization process used to recover polymer from the washed polymer/solvent solution; (k) the design of the thermal stabilizer system which allows for the easy addition of a thermal stabilizer to the polycarbonate prior to devolatilization; (l) techniques for identifying the various trace impurities that can adversely impact the production of high quality polycarbonate resin; (m) the specifications used during the production process that ensures a sufficiently low concentration of impurities; (n) specific information about the composition of each product grade with acceptable ranges of composition; (o) the techniques and know-how learned from the start-up of other polycarbonate plants to optimize the efficient production of high-quality polycarbonate, which is more marketable and commands a higher price than lower-quality material; (p) the optimal methods and techniques to efficiently design, construct and operate a manufacturing plant that produces the highest quality interfacial polycarbonate resin product; and (q) the negative knowledge gleaned after many years on how to best design polycarbonate resin manufacturing plants and optimize the efficient production of high-quality, interfacial polycarbonate (collectively, the "Polycarbonate Trade Secrets").  The Polycarbonate Trade Secrets were the result of an investment of many years and multiple millions of dollars and qualify as trade secrets under applicable law.

9.     Trinseo is an "owner" of the Polycarbonate Trade Secrets as that term is used in 18 U.S.C. § 1839(4).

10.    Trinseo has taken reasonable measures to keep the Polycarbonate Trade Secrets a secret through the use of nondisclosure agreements, licensing agreements with nondisclosure obligations, reasonable building security measures (badges and controlled access points) and computer security measures (such as firewalls and password protocols).   The Polycarbonate Trade Secrets derive actual economic value from not being generally known to, and not being readily ascertainable through proper means by, another person with the ability to obtain economic value from the disclosure or use of the Polycarbonate Trade Secrets.   Through the investments of time and money into the development and continual improvement of Trinseo's Polycarbonate Trade Secrets, Trinseo has, at great cost and expense over many years, uniquely positioned itself as a market leader, in part because Trinseo effectively utilizes the Polycarbonate Trade Secrets to obtain an advantage over competitors which do not know or have access to them.   Trinseo has invested, and will continue to invest, extensive time, effort, and expense in the development, maintenance and confidentiality of its Polycarbonate Trade Secrets.

**B.     KBR gets a taste of the Polycarbonate Trade Secrets.**

11.    In 2007, Dow and the Saudi-owned oil company Saudi Aramco created Sadara Chemical Company, a joint venture formed to establish, build and operate an integrated chemical manufacturing complex in Saudi Arabia with 26 separate operating units.   The initial plan for the complex included the design and construction of an interfacial polycarbonate manufacturing facility.   KBR was selected to provide front-end engineering and design (FEED) engineering services for what became known as the

"Sadara Project".   As part of that project, Dow gave KBR access to aspects of the Polycarbonate Trade Secrets to assist KBR in providing the contemplated FEED work for the polycarbonate manufacturing facility, but only did so because KBR contractually agreed to comply with strict prohibitions against unauthorized use, disclosure or retention of the portion of the Polycarbonate Trade Secrets to which KBR had been given access. Sadara ultimately decided not to build the polycarbonate manufacturing facility at the Sadara Complex and, therefore, KBR had no legitimate reason to retain the Polycarbonate Trade Secrets that Dow shared with KBR for the Sadara Project.   Based upon information and belief, however, it appears that KBR has not only retained copies of some of the data it was required to destroy, but it has also unlawfully used it to further its own business interests.

**C.**     **KBR decides to capitalize on a rapidly expanding polycarbonate market.**

12.     At some point before May 2014, KBR decided it wanted to enter into a new business of developing an interfacial polycarbonate technology, engineering and licensing package to sell to chemical manufacturers around the world, but with an initial focus on Chinese and Russian chemical manufacturers.   KBR believed that worldwide demand for interfacial polycarbonate resin products was on a substantial upswing, especially in China, and KBR wanted to capitalize on this potential market opportunity. One obstacle to its goal, however, was the fact that KBR did not know how to manufacture high-quality, marketable interfacial polycarbonate resins nor did it know how to design a manufacturing plant that could. Consequently, KBR sought out a reputable polycarbonate technology owner with which it could partner.   Hoping to gain

access to the remainder of the Dow polycarbonate technology to which KBR had been given limited access during the Sadara Project, KBR approached Styron (the owner of the Polycarbonate Trade Secrets at the time) about a license of the Polycarbonate Trade Secrets to KBR.  Styron and KBR entered into a confidentiality agreement as a pre-cursor to more in-depth discussions, and in April and May 2014, Styron and KBR began to explore a potential business relationship.  During those discussions, and because KBR entered into the nondisclosure agreement, Styron shared with KBR some higher-level details of its Polycarbonate Trade Secrets.  Ultimately, Styron decided not to enter into a licensing agreement with KBR, and those discussions ended sometime in 2014.

13.    Undaunted, KBR continued to seek licensing arrangements with other polycarbonate technology owners, but those discussions also failed.  KBR's business plan to capitalize on an expanding polycarbonate market teetered on the brink of failure. Rather than admit defeat, and with full knowledge that its window to capitalize on the market opportunity was rapidly closing, KBR decided to develop a "knock-off" version of the Dow polycarbonate technology, and began a zealous search for others whom KBR believed might be able to provide it with access – legal or otherwise – to Dow polycarbonate technology that KBR could then counterfeit as its own.  That search led KBR to Stephen Harper.

**D.     Stephen Harper's background.**

14.    Stephen Harper is a former employee of Dow who, during his employment and while under confidentiality obligations to Dow, was assigned to work at Dow's interfacial polycarbonate manufacturing plant located in Freeport, Texas (the "Freeport

Plant"). Harper claims to have helped design the Freeport Plant and written the process control documents that governed the operation of the Freeport Plant. From 1988 until 1991, Harper was the Plant Manager of the Freeport Plant. By virtue of his position at Dow, Harper obtained copious access to the Polycarbonate Trade Secrets, as did other Dow employees at the Freeport Plant with whom Harper was acquainted, including Lester "Chip" Melton, Bryce Koslan, Randy Smale, William Davis, Richard Kirk, and others (collectively, the "Harper Consultants"). During their employment, Harper and the Harper Consultants were under confidentiality agreements that protected the Polycarbonate Trade Secrets from unauthorized use or disclosure. In approximately 1999, Harper retired from Dow Chemical Company, while the Harper Consultants retired in succession in the years that followed.

15.    In May 2013, Harper formed a company and began to provide process design and project management services to the polycarbonate manufacturing industry. To provide these services, Harper would affiliate with the Harper Consultants (many of whom had by this time also retired from Dow). Together, Harper and the Harper Consultants would provide design, process engineering and start up support for companies desiring to build or operate interfacial polycarbonate resin manufacturing plants. Harper provided his services under a company called Steve Harper Consulting, Inc. ("SHC") but then, for some unknown reason, Harper formed a different company called Polycarbonate Consulting Solutions, LLC ("PCS") in June 2017 and continued his consulting business using PCS, dissolving SHC in 2018.

**E.     KBR misappropriates Trinseo's Polycarbonate Trade Secrets.**

16.     According to Harper, the most technologically advanced, best-in-class, interfacial polycarbonate resin manufacturing plant in the world is located in South Korea – a plant which began as a joint venture around the year 2000 between Dow and LG Chemical, Ltd. (the "LG Plant").   As part of this joint venture, Dow licensed its polycarbonate technology to LG to build and operate a limited number of manufacturing trains.   Dow later assigned its polycarbonate technology and LG license agreement to Trinseo.   Accordingly, Trinseo owns the intellectual property the LG Plant uses to manufacture its specific, unique class of interfacial polycarbonate resins.   Trinseo also owns a polycarbonate manufacturing plant in Stade, Germany which includes a polymer production unit and a compounding facility, manufacturing approximately 120 polycarbonate products for various applications.   The Stade Plant uses the Polycarbonate Trade Secrets to produce and manufacture its products.

17.     Unbeknownst to Trinseo until very recently (thanks in large part to efforts by KBR and Harper to keep their clandestine efforts secret), Harper and his consultants either secretly retained from their employment at Dow, or began to secretly acquire from others who owed confidentiality obligations to Dow, electronically stored detailed design drawings, process flow diagrams ("PFDs"), heat material balance data, and additional trade secrets and/or confidential information relating to the design of the LG Plant, as well as additional materials that constitute "the PFD for a basic Dow technology polycarbonate plant," and start-up and commissioning reports from the Stade Plant. These materials are all subsets of the Polycarbonate Trade Secrets.   Harper admits that he

and his companies use these materials "all the time" to provide their consulting services and that the materials he has no right to use are "priceless," because they constitute "a fortune of engineering data from a state-of-the-art Dow polycarbonate Plant" that will provide those who have access to them with a "high degree of probability for a successful startup and performance" of a polycarbonate manufacturing plant.  Harper further admits that any competitor's use of the subsets of the Polycarbonate Trade Secrets he has will provide a polycarbonate manufacturer a head start and a competitive advantage in the industry, since having access to the information in those materials enables those polycarbonate manufacturers to more quickly produce and sell a higher quality polycarbonate without paying the price in time, effort or expense that Dow and Trinseo have spent over many years.

18.     In 2016 or 2017, KBR learned about Chip Melton and Steve Harper and the services they were willing to provide for large fees.  In April 2017, KBR contacted Melton, and asked if Melton would assist KBR in developing a polycarbonate Basic Engineering Design Package ("BEDP") and technology license package to be sold to customers across the globe for tens of millions of dollars apiece.  Melton contacted Harper about the opportunity, so Harper traveled from Colorado to Houston and met with officers of KBR (including John Derbyshire, the president of KBR Technology and Consulting and an officer of KBR) at KBR's offices in downtown Houston. Unbeknownst to Trinseo, in September 2017 or thereabouts, Harper and PCS secretly entered into an agreement with KBR to provide KBR with polycarbonate engineering and design services to assist KBR in developing and selling KBR's polycarbonate licensing

package, which KBR later named the PCMAX package.  The PCMAX package includes materials on the technological manufacture of interfacial polycarbonates, as well as a basic engineering design package and "proprietary" equipment supply program.  Harper and his company, PCS, served as the technical team leader on the PCMAX package development team.  Harper and the Harper Consultants worked through PCS to provide a Preliminary Design Package, also known as a PDP, and ongoing consulting services to support KBR's efforts to develop its PCMAX package, parts of which include the most critical aspects of the Polycarbonate Trade Secrets, without which the PCMAX package would be much less valuable, and perhaps worthless.

19.    In February 2018, KBR's parent company announced that KBR had sold its first allegedly "proprietary" PCMAX package to Chinese chemical manufacturer Cangzhou Dahua New Materials Co., Ltd. (CDNM) so that it could build a new polycarbonate plant in Cangzhou City, China.  In the press release, KBR quoted the Chairman of CDNM as stating that the "polycarbonate market in China is booming" and "by using KBR's advanced technology, we can achieve the best quality of products and place ourselves in the leading position in this new market."  In that same press release, KBR falsely claimed that its PCMAX package was "proprietary" and "unique" when, in fact, it is materially based in part upon Trinseo's misappropriated Polycarbonate Trade Secrets that KBR obtained from Harper and PCS.

20.    In August 2018, KBR announced that it had been awarded a license, engineering and proprietary equipment supply contract by China Pingmei Shenma Group (PMSM) to build two new polycarbonate plants in China using KBR's allegedly

"proprietary" PCMAX technology, which KBR said would "empower PMSM to be a market leader in the polycarbonate business."  In that same press release, KBR falsely claimed that its PCMAX package was "proprietary" when, in fact, it is materially based in part upon Trinseo's misappropriated Polycarbonate Trade Secrets that KBR obtained from Harper and PCS.

21.     Upon information and belief, KBR's Technology and Consulting Division booked approximately forty million dollars in revenue from the PMSM and CDNM contract awards.

22.     Upon information and belief, KBR has, without Trinseo's authorization, obtained from Harper a critical mass of data from Trinseo's Polycarbonate Trade Secrets that enabled KBR to create its PCMAX program without paying the price in time, effort or expense and with full knowledge that the data and information from Harper was derived from misappropriated, critical portions of Trinseo's Polycarbonate Trade Secrets. KBR and its actual or apparent agents knew, or had reason to know, that KBR's access to the Polycarbonate Trade Secrets came from persons who acquired the Polycarbonate Trade Secrets using improper means and that their use of the Polycarbonate Trade Secrets violated duties that these persons owed to the trade secret owner under applicable law. Alternatively, KBR has used or disclosed the Polycarbonate Trade Secrets without express or implied consent from Trinseo, and in doing so, KBR: (a) used improper means to acquire knowledge of the Polycarbonate Trade Secrets; and/or (b) at the time KBR engaged in its unauthorized use and/or disclosure of the Polycarbonate Trade Secrets, knew or had reason to know that its knowledge and access of the Polycarbonate Trade

Secret data from Harper and his company was either (i) derived from or through persons who used improper means to acquire the Polycarbonate Trade Secrets; and/or (ii) derived from or through persons who owed a duty to maintain the secrecy of the Polycarbonate Trade Secrets. Alternatively, and well before KBR ever materially changed its position, KBR used or disclosed the Polycarbonate Trade Secrets without express or implied consent from Trinseo while KBR knew or had reason to know that the information or data Harper was providing was derived from Trinseo's Polycarbonate Trade Secrets and that Harper and the Harper consultants had acquired knowledge of the trade secrets by accident or mistake. As a result, KBR has "misappropriated" Trinseo's Polycarbonate Trade Secrets, as that term is used in 18 U.S.C. § 1839(5).

**F.    Trinseo has been irreparably harmed.**

23.    Trinseo has been irreparably harmed by KBR's conduct in misappropriating and using Trinseo's Polycarbonate Trade Secrets to enrich itself, and others, at Trinseo's expense.

24.    By engaging in the conduct discussed above, KBR has not only become a competitor to Trinseo in the interfacial polycarbonate licensing business, but it has also enabled other competitors to obtain – in the span of a few months – a competitive advantage it took Trinseo and its predecessor many years and millions of dollars to develop and maintain. By doing so, KBR has materially damaged Trinseo's competitive advantages and goodwill, while also diluting the value of the Polycarbonate Trade Secrets. KBR has also unlawfully enriched itself, at Trinseo's expense, with millions of dollars in revenues it was only able to earn, when it did, by the unlawful acquisition,

misappropriation and use of information derived from Trinseo's Polycarbonate Trade Secrets.   The events set forth above have caused irreparable harm and significant monetary damages to Trinseo that, at the present time, are incalculable.

**G.      KBR lacks a valid statute of limitations or laches defense.**

25.     To the extent KBR contends that any claims asserted herein are barred by a statute of limitations, KBR is estopped from asserting that defense.   First, KBR, and its actual or apparent agents and employees, fraudulently concealed its unlawful conduct during a time when KBR: (a) actually knew it was harming Trinseo (since it knew Trinseo owned the trade secrets through the 2014 discussions with Styron, Trinseo's prior company name); (b) maintained a duty to disclose its misconduct (by virtue of, among other things, the agreements between Styron and KBR in 2014) and (c) possessed a fixed purpose to conceal the wrong (by hiding the identity of the source of its polycarbonate technology in its public pronouncements and advertising, and by having its assistant general counsel deny the validity of Trinseo's concerns in a series of letters between Trinseo and KBR in August, September and October 2019 while knowing full well that Harper's work for KBR was premised upon misappropriated trade secrets and confidential information that Trinseo owned and that Harper and his consultants had misappropriated from Dow).   KBR's fraudulent concealment tolled any statute of limitations until Trinseo could discover the claims, or could have discovered the underlying facts, with reasonable diligence.

26.     Any purposed limitations or laches defense is also barred by the discovery rule since KBR's scheme was inherently undiscoverable and the evidence of injury was

not objectively verifiable until recently.  Even using reasonable due diligence, Trinseo could not have discovered the full panoply of KBR's wrongful conduct and Trinseo's corresponding injuries, sooner than it did.

27.     Finally, any laches argument KBR may offer is barred by KBR's own unclean hands in knowingly misappropriating Trinseo's intellectual property and fraudulently concealing it from Trinseo while under a duty to disclose those facts to Trinseo.

28.     Trinseo contends that every factual allegation in the opening paragraph, and in Paragraphs 8-22 above and 30-44 below will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.  FED. R. CIV. P. 11(b)(3).

## IV.
## Causes of Action

## Count 1
## Misappropriation of Trade Secrets in Violation of
## the Federal Defend Trade Secrets Act

29.     Trinseo re-alleges and incorporates by reference each and every allegation contained in the above paragraphs of this Complaint.

30.     Trinseo owns the Polycarbonate Trade Secrets.  The Polycarbonate Trade Secrets are related to a product or service used, or intended for use in, interstate or foreign commerce.  The Polycarbonate Trade Secrets meet the definition of "trade secrets" under 18 U.S.C. § 1839(3) because they constitute business, scientific, technical, economic, or engineering information (including patterns, plans, compilations, formulas, designs, methods, techniques, and processes).  Trinseo has taken reasonable measures to

keep the Polycarbonate Trade Secrets secret, and the Polycarbonate Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who has the ability to derive or obtain economic value from the disclosure or use of the Polycarbonate Trade Secrets.

31.     KBR has willfully and maliciously misappropriated critical data from the Polycarbonate Trade Secrets by acquiring, using and/or disclosing them in interstate and international commerce as described above, without Trinseo's express or implied consent, both to enrich itself and materially aid Trinseo's direct competitors.  KBR knew, or had reason to know, that the Polycarbonate Trade Secrets had been acquired by improper means, as set forth in Paragraph 22 above.  Thus, KBR has "misappropriated" Trinseo's Polycarbonate Trade Secrets, as that term is used in 18 U.S.C. § 1839(5).

32.     Unless enjoined as requested below, KBR's continued misappropriation of the Polycarbonate Trade Secrets has caused, and will continue to cause, irreparable injury to Trinseo.  Trinseo has no adequate remedy at law to ameliorate the harm caused by the existing and continued misappropriation of the Polycarbonate Trade Secrets. Accordingly, Trinseo seeks preliminary and permanent injunctive relief as permitted by 18 U.S.C. § 1836(3)(A).

33.     As a direct, proximate and foreseeable result of KBR's misappropriation of trade secrets, actual or threatened, Trinseo has been damaged in an amount not yet fully ascertained through the loss of business opportunities and corresponding profits, the unlawful head start that KBR was able to obtain in the polycarbonate licensing industry,

the potential diminution of the value of Trinseo's Polycarbonate Trade Secrets, and by enabling Chinese polycarbonate manufacturers to quickly ramp up production at a much lower total investment cost, which will soon lead to further flooding the market with polycarbonate resin and a corresponding continued erosion of Trinseo's profit margins and revenue from its polycarbonate manufacturing business unit.  KBR's conduct also threatens irreparable harm to its Trinseo's goodwill and reputation as a market leader and exclusive source of the Polycarbonate Trade Secrets.

34.    KBR's misappropriation of the Polycarbonate Trade Secrets was willful, malicious, and done with the deliberate intent to injure Trinseo's business, thereby entitling Trinseo to exemplary damages and/or attorneys' fees in an amount to be proven at trial.

<u>**Count 2**</u>
**Common-Law Misappropriation of Confidential Information**

35.    Trinseo incorporates the foregoing paragraphs by reference as if fully set forth herein.

36.    To the extent that the information KBR has wrongfully acquired and disclosed for its monetary benefit does not constitute "trade secrets" but instead constitutes confidential information, Trinseo hereby asserts this claim for common law misappropriation of trade secrets under Texas law.  Texas law applies to this claim, and to the other tort claims asserted below, because, with respect to the events made the basis of those claims, Texas has the most significant relationship to the occurrence and the parties when considering the place where the conduct causing the injury occurred, the

defendant's principal place of business, and the unlawful benefits inuring to KBR while located in Texas.

37.     The Polycarbonate Trade Secrets constitute protected confidential information under Texas law, because they are compilations of information that Trinseo uses in its business, which gives Trinseo an opportunity to obtain an advantage over competitors who do not know it or use the information.  Trinseo owned this confidential information and took reasonable steps under the circumstances to keep that information substantially secret.

38.     KBR has unlawfully and through improper means misappropriated a large portion of Trinseo's confidential information and is commercially using that information in the course of a competing business, unlawfully enriching itself while giving it, and Trinseo's competitors, a head start in the marketplace without having to spend the time, effort or expense that any honest business has to incur.  That unlawful head start will also contribute to the dramatic oversupply of competing interfacial polycarbonate resin in the marketplace from Chinese manufacturers, which will certainly lead to the continued erosion of Trinseo's profits from its polycarbonate business unit.   Such conduct constitutes unlawful misappropriation of Trinseo's confidential information under Texas common law, and Texas law applies because the theft of the information, and the benefits KBR enjoyed as a result, all occurred in Houston, Texas.  As a consequence, Trinseo has suffered and will continue to suffer irreparable harm for which it hereby seeks injunctive relief and damages.

## Count 3
## Conversion

39.     Trinseo re-alleges and incorporates by reference each and every allegation contained in the above paragraphs of this Complaint.

40.     Trinseo owns trade secrets and confidential information relating to its interfacial polycarbonate resin business as described in Paragraph 8 above.  KBR has unlawfully and without authorization assumed and exercised control over that property to the exclusion of, or inconsistent with, Trinseo's rights as an owner of that property.  At the time KBR assumed control over Trinseo's intellectual property, that intellectual property had been merged into tangible forms.  KBR has thereby damaged Trinseo in an amount to be determined at trial.

## Count 4
## Civil Conspiracy

41.     Trinseo re-alleges and incorporates by reference each and every allegation contained in the above paragraphs of this Complaint.

42.     By unlawfully acquiring, disclosing and/or and using the Polycarbonate Trade Secrets, KBR has intentionally combined to accomplish and agreed to accomplish an unlawful purpose, and/or has intentionally combined to accomplish a lawful purpose by unlawful means by engaging in one or more unlawful overt acts which proximately caused Trinseo to suffer damages.  KBR conspired with co-conspirators Stephen Harper and Polycarbonate Consulting Services, Inc. (and potentially others).  In doing so, KBR intended to do more than merely engage in the conduct that resulted in the injury and damages to Trinseo; rather KBR was actually aware of the harm likely to result from its

wrongful conduct, and did it anyway.  Such conduct constitutes an unlawful civil conspiracy under Texas law for which Trinseo now sues.

### Count 5
### Unjust Enrichment

43.     Trinseo re-alleges and incorporates by reference each and every allegation contained in the above paragraphs of this Complaint.

44.     KBR obtained a benefit by fraud and the taking of an undue advantage, and has wrongfully secured or passively received benefits which it would be unconscionable for it to retain.  Accordingly, Trinseo sues KBR to require it to pay in restitution to Trinseo a sum of money equivalent to the benefit KBR unlawfully and unfairly obtained.

### V.
### Remedies Sought

### Count 1
### Application for Preliminary Injunction

45.     Trinseo re-alleges and incorporates by reference each and every allegation contained in the above paragraphs of this Complaint.

46.     As will be proven at the hearing on Trinseo's Application for Preliminary Injunction, there is a likelihood of success on the merits of Trinseo's claims, and the balancing of equities favors the issuance of a preliminary and eventual permanent injunction against KBR.  As a direct and proximate result of KBR's conduct as described above, Trinseo has suffered irreparable harm through the potential loss of the secrecy of the Polycarbonate Trade Secrets, which constitutes irreparable injury as a matter of law. *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 503 (5th Cir. 1982).

47.   For trade secret theft cases under Texas law, state law governs whether certain injuries qualify as irreparable for the purposes of granting a preliminary injunction.  *Heil Trailer Int'l Co. v. Kula*, 542 Fed. App'x 329, 335 (5th Cir. 2013).  To show irreparable harm for misappropriation of confidential information under Texas law, a movant need show only that the defendant possesses the confidential information and is in a position to use it.  *Sharma v. Vinmar, Ltd*., 231 S.W.3d 405, 427 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding that irreparable harm can be established by evidence that disclosure of confidential information or trade secrets could enable competitors to misuse plaintiff's marketing plans and strategies to avoid the less successful strategies as well as the risk and expense of developing the trade secrets or confidential information); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc*., 965 S.W.2d 18, 24 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd) ("[i]njunctive relief is proper to prevent a party, that has appropriated another's trade secrets, from gaining unfair market advantage" and affirming trial court's order granting temporary injunctive relief where defendants possessed plaintiff's confidential information and there was an inherent threat that they were likely to use it); *Rugen v. Interactive Bus. Sys., Inc*., 864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ) ("injunctive relief is recognized as a proper remedy to protect confidential information and trade secrets.").  Finally, "[l]oss of business goodwill or loss that is not easily calculated in pecuniary terms is sufficient to show irreparable injury for purposes of obtaining preliminary injunctive relief.  *IAC, Ltd. v. Bell Helicopter Textron, Inc*., 160 S.W.3d 191, 200 (Tex. App.—Fort Worth 2005, no pet.); *Graham v. Mary Kay, Inc*., 25 S.W.3d 749, 753 (Tex. App.—Houston [14th Dist.]

2000, pet. denied) ("A company's loss of goodwill, clientele, marketing techniques, office stability and the like are not easily assigned a dollar value, but they qualify as 'probable injury' for purposes of injunctive relief.").

48.     Because KBR possesses critical data derived from the Polycarbonate Trade Secrets and has unlawfully used and misappropriated that data, the element of irreparable injury is established.

49.     The total loss to Trinseo cannot be accurately measured at this time, although actual damages are anticipated to exceed more than ten million dollars.  At this point, however, Trinseo has no adequate remedy at law.  KBR has – without paying the concomitant price in effort, time or expense – obtained for itself in months what it took Trinseo's predecessors many years and multiple millions of dollars to develop, maintain, monetize and improve and, by doing so, KBR has contributed to the destruction of Trinseo's lawfully obtained competitive advantages and the diminution of the value of its intellectual property and corresponding goodwill.  Such harm qualifies as irreparable harm for which preliminary injunctive relief is uniquely appropriate.

50.     Trinseo has no adequate remedy at law, as the immediate harm KBR has caused Trinseo cannot, at this point, be completely measured or calculated.  "[A] finding of irreparable harm is appropriate even where economic rights are involved when the nature of those rights makes establishment of the dollar value of the loss especially difficult or speculative."  *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 (5th Cir. 1989) (internal citations omitted).  Without immediate and permanent injunctive

relief, KBR's continued use and disclosure of Trinseo's Polycarbonate Trade Secrets could cause the value of such trade secrets to be lost forever.

51.     Continued harm is imminent to Trinseo because KBR is wrongfully using Trinseo's confidential and trade secret information not only to enrich KBR, but also to assist Trinseo's Chinese competitors in creating competing polycarbonate manufacturing facilities without paying the price in time, effort or expense.  Those facilities, once completed and on-stream, will materially erode Trinseo's lawfully obtained competitive advantages and the value of its intellectual property, damage its goodwill, and reduce profits from its polycarbonate manufacturing business unit.

52.     The balancing of equities favors Trinseo.  The magnitude of the injury Trinseo has suffered because of KBR's unlawful conduct substantially outweighs whatever hardship KBR could allege or prove from being restrained as requested below. Besides, when conduct is willful (as KBR's conduct has clearly been), the Court need not balance hardship.  *United States v. Marine Shale Processors*, 81 F.3d 1329, 1358-59 (5th Cir. 1996).

53.     The granting of Trinseo's requested injunctive relief would not adversely affect public policy or public interest.  The public has an interest in the Court's granting of this relief to ensure that trade secrets or confidential information are not unlawfully appropriated to companies overseas, and that individuals and companies in the United States abide by federal and state law.  *CGC Royalty Investments I, LLC v. Order Simplicity, LLC*, 3:18-CV-0711-N, 2018 WL 3589085, at *4 (N.D. Tex. June 4, 2018)

(granting preliminary injunction in trade secret case under Texas statute because, among other reasons, "the public interest is served by protecting trade secret information").

54.     KBR would face no significant harm by complying with an injunction barring it from continued possession, use, sale or disclosure of data derived from Trinseo's Polycarbonate Trade Secrets and confidential information, since the Polycarbonate Trade Secrets do not belong to KBR and it has no right to use them in the first place, much less profit from their use and disclosure.  In contrast, in the absence of such an injunction, the damage that will result from KBR's continued possession, use or disclosure of the Polycarbonate Trade Secrets cannot be undone.

55.     Trinseo is willing to post a bond in the amount, if any, that the Court deems reasonably appropriate.

56.     Injunctive relief is also authorized by 18 U.S.C. § 1836(b)(3)(A), and, as such, Trinseo need not prove irreparable injury or inadequacy of other remedies, but must, instead, merely show a prima facie case of illegality and that the injunction would fulfill the legislative purpose of the statute.  *See, e.g.*, *Commodity Futures Trading Commission v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978); *Donovan v. Brown Equip. & Service Tools, Inc*., 666 F.2d 148, 157 (5th Cir. 1982).

57.     Consequently, Trinseo requests a Preliminary Injunction under FED. R. CIV. P. 65 against KBR and its agents, servants, employees, and those persons in active concert or participation with it who receive actual notice of the order by personal service or otherwise, that:

a.      prohibits KBR from destroying, altering, erasing, secreting, or failing to preserve any documents or electronically stored information ("ESI") that: (i) comprises or embodies the Polycarbonate Trade Secrets; (ii) constitutes or comprises any other proprietary information, confidential information, or trade secrets that KBR obtained from, or which may have originated from, Dow Chemical Company, Stephen Harper, the Harper Consultants or any entity owned or controlled by Harper or the Harper Consultants, if such materials, documents or ESI relate to polycarbonate production, manufacturing, or design; (iii) the documents, data or ESI that reflect the source and origin of the components of KBR's PCMAX licensing and technology package, BEDP and equipment specifications; (iv) the documents, data or ESI that reflect or comprise communications between KBR, the Harper Consultants, PMSM, CDNM, LG Chemical, or any other entity regarding the Polycarbonate Trade Secrets or the manufacture of interfacial polycarbonate; or (v) reflect or evidence the manner in which KBR acquired or has used or disclosed the Polycarbonate Trade Secrets (collectively the "Relevant Evidence");

b.      orders KBR to forensically preserve, within 5 days of the Court's order and at the sole cost and expense of KBR, the Relevant Evidence, and turn over the Relevant Evidence to a neutral third party forensics provider for safekeeping and eventual return to Trinseo of all the embodiments of the Polycarbonate Trade Secrets within KBR's possession, custody, or control, as permitted by 18 U.S.C. § 1836(b)(3)(A)(ii);

c.      prohibits KBR from using, in any way, the Polycarbonate Trade Secrets or any materials, data, documents or ESI that are derived from the Polycarbonate Trade Secrets (except to defend itself in this lawsuit);

d.      prohibits KBR from continuing to work for or provide any polycarbonate consulting or engineering services to PMSM, CDNM, or any person or entity worldwide that intends to offer or is planning to offer interfacial polycarbonate manufacturing or engineering services, as permitted by 18 U.S.C. § 1836(b)(3)(A)(i)(I);

e.      prohibits KBR from the marketing or sale of its PCMAX polycarbonate package, in its current form, to any person or entity worldwide.

## Count 2
### Permanent Injunction

58.     Trinseo re-alleges and incorporates by reference each and every allegation contained in the above paragraphs of this Complaint.

59.     Trinseo requests a permanent injunction against KBR that prohibits KBR (directly or indirectly, and whether alone or in concert with others), from ever possessing, using, or disclosing Trinseo's Polycarbonate Trade Secrets, or documents, data/ESI derived therefrom, and requires KBR to disgorge all embodiments and benefits from its unlawful misappropriation and/or use of the Polycarbonate Trade Secrets.

## Count 3
### Damages

60.     Trinseo re-alleges and incorporates by reference each and every allegation contained in the above paragraphs of this Complaint.

61.     Trinseo requests that the Court award it its actual damages as proven at the time of trial.

## Count 4
### Disgorgement/Forfeiture

62.     Trinseo re-alleges and incorporates by reference each and every allegation contained in the above paragraphs of this Complaint.

63.     Trinseo requests the Court to disgorge from KBR all funds, profits, property or benefits unjustly obtained from the schemes set forth above, as permitted by 18 U.S.C. § 1836(b)(3)(B) and applicable common law.

## Count 5
## Punitive Damages

64.     Trinseo re-alleges and incorporates by reference each and every allegation contained in the above paragraphs of this Complaint.

65.     Because KBR has, by clear and convincing evidence, acted with either willful or malicious intent, or actual malice or fraud, with respect to the harms discussed herein, Trinseo is entitled to and requests an award of punitive damages against KBR under the DTSA and under Texas law.   The punitive damages are unlimited by the statutory caps provided by Texas law, since the conduct by KBR amounts to commercial bribery and a crime as defined by Texas law.

## Count 6
## Accounting

66.     Trinseo re-alleges and incorporates by reference each and every allegation contained in the above paragraphs of this Complaint.

67.     Trinseo requests the Court to order KBR to account for its use of the Polycarbonate Trade Secrets, and all profits resulting from such use and disclosure.

## Count 7
## Attorney's Fees & Costs

68.     Trinseo re-alleges and incorporates by reference each and every allegation contained in the above paragraphs of this Complaint.

69.     Because of KBR's wrongful acts, Trinseo had to engage the undersigned law firm to enforce its rights.  Trinseo is entitled to and requests from the Court an award of its reasonable attorneys' fees and costs against KBR under 18 U.S.C. § 1836(b)(3)(D).

## Count 8
## Constructive Trust

70.     Trinseo re-alleges and incorporates by reference each and every allegation contained in the above paragraphs of this Complaint.

71.     Trinseo requests the Court to impose a constructive trust over any money or property owned by KBR that can be traced back to the ill-gotten gains from the schemes outlined above.

## Prayer

Trinseo prays that KBR be cited to appear and answer herein, and thereafter, that Trinseo recover judgment against KBR as follows:

  a. actual damages and disgorgement of unjustly obtained benefits;

  b. an equitable accounting;

  c. injunctive relief as outlined above and determined by the Court;

  d. punitive damages;

  e. reasonable attorneys' fees;

  f. a constructive trust;

  g. pre-judgment interest at the maximum non-usurious rate;

  h. all taxable court costs; and

  i. all other relief to which Trinseo may show itself entitled.

DATED:  November 27, 2020                    Respectfully submitted,

**HICKS THOMAS LLP**
A REGISTERED LIMITED LIABILITY PARTNERSHIP

By: _____
**Stewart Hoffer (Attorney in Charge)**
Texas Bar No. 00790891
S.D. Tex. I.D. No. 20123
shoffer@hicks-thomas.com
**Stephen Loftin**
Texas Bar. No. 12489510
sloftin@hicks-thomas.com
**Joshua H. Bauer**
Texas Bar No. 24084380
jbauer@hicks-thomas.com
**Colin Watterson**
Texas Bar No. 24093330
cwatterson@hicks-thomas.com
700 Louisiana, Suite 2300
Houston, Texas 77002
713.547.9100 (Telephone)
713.547.9150 (Facsimile)

**Attorneys for Plaintiff Trinseo S.A.**